MARY H. STOWELL

*v.*

JOHN E. SPENCER *et al.*

*Opinion filed June 19, 1901.*

1. EJECTMENT—*what makes a prima facie case in ejectment.* Plaintiff in ejectment makes a *prima facie* case by introducing her deed in evidence and proving title in her grantor and possession by him.

2. APPEALS AND ERRORS—*when defendant in error cannot complain of rulings on evidence.* On writ of error by the plaintiff in ejectment to reverse a judgment for the defendant, the latter cannot, in the absence of an assignment of cross-errors, complain that the court improperly admitted evidence for the plaintiff.

3. EVIDENCE—*effect of previous adulterous relations upon subsequent transactions between the parties.* The fact of previous adulterous relations between parties does not justify the conclusion, as one of law, that all their subsequent transactions were tainted with such illegal conduct.

4. The court reviews the evidence in this case, and holds it insufficient to establish the defense that plaintiff's deed, relied upon for title in ejectment, was based upon the consideration of adulterous cohabitation.

WRIT OF ERROR to the Circuit Court of Rock Island county; the Hon. F. D. RAMSAY, Judge, presiding.

J. KENT GREEN, for plaintiff in error.

J. T. KENWORTHY, and S. R. KENWORTHY, for defendants in error.

Mr. CHIEF JUSTICE WILKIN delivered the opinion of the court:

This is an action of ejectment, begun in the circuit court of Rock Island county in April, 1898, by Mary H. Stowell, an insane person, who appeared by conservatrix, against John E. Spencer and others, to recover the south fifty feet of lot 1, block 9, of John W. Spencer's addition to the city of Rock Island. Defendants pleaded the general issue and the trial resulted in a verdict for them,

the jury being instructed by the court, at the conclusion of the hearing, to so find. Plaintiff brings the cause to this court upon writ of error, to reverse the judgment below.

On March 4, 1868, the title to the premises was in William R. Ayers. At this time he was living away from home but a part of the property was occupied by his family. The lot in question is covered by three dwelling houses joined together under one roof, the south apartment, constituting the homestead, having a frontage of about twenty feet. The wife of Ayers continued to reside in the homestead until the time of her death, in 1897. On March 4, 1868, Ayers, for an expressed consideration of $500 stated in the deed, quit-claimed this and other property to Mary H. Stowell, a widow, residing in Chicago. Some time before March 17, 1898, Mrs. Stowell became insane, and on that date Mary M. Bartelme was appointed her conservatrix, by whom this action of ejectment was brought.

In making out her case plaintiff introduced the deed of March 4, 1868, and proved title in her grantor and possession by him, thereby establishing a *prima facie* title in herself. (*Harrell* v. *Enterprise Savings Bank*, 183 Ill. 538.) She also proved a connected title from the government. While some of the evidence offered to prove the various links in that chain of title was objected to upon the trial, the objections were overruled and the evidence admitted. Defendants have assigned no cross-errors upon this record, and hence cannot be heard to say, as is now contended, that the court improperly admitted that evidence. But aside from this, the plaintiff having established a *prima facie* title to the lands, the question must be, have the defendants successfully overcome that title? They made no attempt to prove title in themselves, but their endeavor was to prove an outstanding title by offering in evidence certain deeds executed by the plaintiff to third parties. The evidence, however, on behalf of the plain-

tiff introduced in rebuttal shows beyond controversy that by re-conveyances and a decree in chancery the title was re-invested in plaintiff.

The real defense relied upon by defendants was that the conveyance by William R. Ayers to the plaintiff was made in consideration of adulterous cohabitation between the parties, and was therefore illegal and void, and it appears that upon this defense the court took the case from the jury. The only evidence admitted upon the trial in support of this defense was the answer and amended answer by the plaintiff to a bill in chancery filed by William R. Ayers against her in 1877, in the Rock Island circuit court, to remove as a cloud upon his title the deed offered in evidence of March 4, 1868, and for an accounting between the parties.

Admitting, for the purposes of this opinion, that the defendants below (being, so far as the proof shows, strangers to the title,) could interpose that defense in this action, the question is, did these answers, taken as a whole, establish the defense as a matter of law, so as to justify the court in peremptorily instructing the jury to find for the defendants? The theory of the defendants in error is, that by her said answers the plaintiff conclusively admits the illegal consideration of the deed from Ayers to her. It will not be denied that upon this theory the plaintiff below had a right to have the answers considered as a whole, and that the defendants could not single out particular parts of them disconnected from other parts, and insist that only those statements which were against her interest should be considered. From the answers the following facts, in substance, appear:

In the spring of 1866 Ayers made the acquaintance of plaintiff in error, who resided in Chicago, the widow of a Union soldier, drawing a pension of $100 per year. He loaned her $100, which she used in part payment for furniture for a boarding house, which business she afterwards conducted. Some time after this Ayers became a

boarder at her house. They became well acquainted, and
later formed an attachment for each other, and he sought
in every way to induce her to marry him, representing
himself to be a widower with three children, and claim-
ing to own valuable property in Rock Island. He pro-
posed to her that if she would marry him and adopt and
care for his three children as her own, he would con-
vey to her this Rock Island property, which he said was
worth about $3000, which proposition she agreed to ac-
cept. From that time he was constant in his devotion
to her, and about three months thereafter proposed to
her to at once assume the relationship of husband and
wife without marriage, promising that in a short time
their marriage should be legally solemnized, and at the
same time gave her a plausible reason for the delay. She
refused to comply with his request for a long time, but
finally yielded, and about January 1, 1867, they announced
to their friends that they were married. In March fol-
lowing she discovered that she was pregnant, and earn-
estly requested him to keep his promise of marriage,
which he refused to do then, but still promised to do so
before the birth of the child. As to the making of the
deed he promised to do as he had agreed, but stated that
it would not be good in law unless some consideration
was expressed therein; that he would have the deed
made out for the consideration expressed at $2500, to be
paid for in boarding and lodging him and his three chil-
dren; that he would allow her $4 per week each for him-
self and son and $3 per week each for his two daughters,
making $14 per week or $728 a year for their board and
lodging; that a deed was made and delivered to her on
March 26, 1867, conveying the undivided two-thirds, only,
of the lands; that she sent the deed to an attorney at
Rock Island and had it recorded, at the same time au-
thorizing the attorney to collect the rents for her; that
the attorney replied that a Mrs. Ayers was collecting the
rents and claiming to own the property; that she then

suspected the Mrs. Ayers who claimed the lands was the wife of the Ayers with whom she had been living, and upon confronting him with her suspicions he confessed it, but explained that he was getting a divorce from his wife and as soon as it was granted would marry her; that she had advanced so far into the relation that she could no longer turn back, and her sole hope was that he would obtain a divorce, marry her and save her from disgrace; that after the making of this deed, she being entitled to the rents of the property and not being able to get them, Ayers agreed with her that inasmuch as the children were being kept by their mother, his then real wife, at Rock Island, the rent the said wife derived from the property should go to pay their board with her, and that he (Ayers) would indorse the amount of their board upon the said contract the same as though they were boarding with her, Mrs. Stowell; that she continued to conduct her boarding house in Chicago and Ayers continued to reside with her, contributing nothing to provide the living, but, on the other hand, he collected large sums of money from her boarders and used it himself; that about March, 1868, he informed her that by his deed to her he had conveyed only two-thirds of the property; that she requested him to make a deed of all the property, but he refused to do so unless she would give him $500 in cash or its equivalent, which she agreed to do and did do, and on March 4, 1868, he executed and delivered to her another deed purporting to convey the whole of the land in controversy, being the deed to her first above mentioned; that the $500 was paid to Ayers by giving him a chattel mortgage on her household furniture; that at his solicitation she quit keeping boarders and opened up a second-hand store, largely stocking it with her own furniture which had been used in the boarding house; that Ayers selected from the stock of furniture the articles covered by his mortgage, sold them and kept the money; that this depleted her stock very much, but she managed

to build up a good trade afterwards; that again at his solicitation she ceased conducting the second-hand store and opened up a confectionery and family-supply store, and in a short time built up a good business in that line; that she about this time gave Ayers $200, which he said was necessary to further his divorce proceeding in Rock Island county, and this sum was to be charged to him upon their mutual account; that about July 10, 1871, she found the original contract upon which Ayers was to endorse payments of board and the $50 per month as rent from her property and the $200 advanced, but none was credited thereon; that she then determined to get control of the property, and placed the matter in the hands of attorneys in Chicago, together with her deeds to the property; that the great Chicago fire destroyed her home and business and left her with nothing, and the deeds which she had placed in the hands of her attorneys were destroyed in the same way; that when the fire got near her place Ayers went to the money drawer and took out what money there was, amounting to about $20, and abandoned her; that she obtained relief from charity and was lodged in a relief shanty; that when she became so located Ayers once more came back and took up his residence with her; that he again proposed to consummate the marriage if she would deed him back the property; that no longer having faith in his promises she refused to make the deeds; that he then threatened to accuse her of the crime of larceny and have her sent to the penitentiary if she did not sign the deeds, but she refused; that he even beat and kicked her, and at one time was arrested and locked up for it; that after the fire, with the aid of her pension and the kindness of some friends, she was enabled to again start a small confectionery store, which soon grew to be a paying business; that Ayers once more returned, making great pretenses of affection for her, and stating that his divorce had just been granted and that their marriage was near at hand; that he had found a

splendid establishment which could be purchased very cheap, and he wanted her to sell the Rock Island property and her own property in Michigan to effect the purchase; that she went to Michigan for the purpose of selling her property there, but was persuaded not to trust Ayers and decided to retain her property; that she so wrote him from Michigan; that this enraged him, and before her return he sold out her business and the personal property, and when she returned it was beyond her recovery; that the total amount of money owed her on their mutual account was $7577; that during the time they lived together she furnished him with all his board, the money he spent and the clothes he wore; that she was at all times anxious to have the marriage consummated and relieve her from the disgrace she must suffer when the fact that they were not married should become generally known.

The foregoing extended statement, taken from the answers relied upon by defendants, has seemed necessary in order to get a fair understanding of the relations between Ayers, the grantor, and plaintiff, the grantee. It must be admitted that she was not free from fault, and it may be that she was influenced to maintain the relationship of husband and wife with Ayers knowing that he was a married man, for the purpose of avoiding the loss of her pension as the widow of a deceased soldier. However all this may be, we are unable to see upon what theory the court below could say upon this answer, as a matter of law, that the consideration for the deed of March 4, 1868, was illegal. According to the allegations of the answer it was in consideration of $500, secured by her and actually paid out of her own property to Ayers, the grantor. We know of no rule that would justify the conclusion, as one of law, that because the previous relations between the parties had been adulterous, all subsequent transactions between them should be treated as tainted with such illegal conduct. In our opinion the

defense was not made out,—certainly not to the extent of justifying the court in taking the case from the jury and peremptorily directing a verdict against the plaintiff.

The judgment of the circuit court will therefore be reversed, and the cause will be remanded to that court for further proceedings not inconsistent with the views herein expressed.

*Reversed and remanded.*